```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/14/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                           :

UNITED STATES OF AMERICA,                  :

                                             :

            -v-                             :               20-CR-144 (VSB)

                                             :

JOSHUA GUMORA,                       :              **OPINION & ORDER**

                                             :

                          Defendant.          :

                                             :

----------------------------------------------------------------------X

**VERNON S. BRODERICK, United States District Judge:**

      Defendant Joshua Gumora ("Defendant" or "Gumora") was initially charged in a

criminal complaint ("Complaint") on December 16, 2019, with distribution and possession with

intent to distribute methamphetamine and ketamine, in violation of Title 21, United States Code,

Sections 841(a), (b)(1)(C), and (b)(1)(E), and with being a felon in possession of a firearm, in

violation of Title 18, United States Code, Sections 922(g)(1) and 2.  (Doc. 1.)  On February 19,

2020, a grand jury sitting in the Southern District of New York returned an indictment against

Gumora charging him with the same violations charged in the criminal complaint as well as a

forfeiture allegation pursuant to Title 21, United States Code, Section 853.  (Doc. 15.)  Currently

before me is Defendant's motion seeking release on bond pursuant to Title 18, United States

Code, Section 3142(i) and Federal Rule of Criminal Procedure 46.  (Doc. 20.)  For the reasons

stated on the record during the April 6, 2020, telephonic detention hearing, and—as described

more fully below—because I find after balancing the reasons advanced for temporary release

against Defendant's risk of flight and danger to the community that temporary release is not

appropriate under Section 3142(i), Defendant's motion is DENIED.

I.     **Background**[1]

On June 21, 2019, Defendant Gumora got into a verbal argument with his girlfriend at the time (the "Victim") inside her apartment (the "Victim's Apartment").  (Compl. ¶ 6(a).)[2]  During the argument, Defendant brandished a firearm at the Victim.  (*Id.* ¶ 6(b).)  Defendant then left the apartment and sent the Victim a text message stating "I will break your fucking jaw."  (Wolf Ltr. 1.)[3]

The next day, pursuant to an agreement with the Victim, Defendant removed his belongings from the Victim's Apartment when the Victim was not home.  Specifically, Defendant removed a gun and narcotics from the Victim's Apartment, "placed them in a carry-on luggage bag, brought them to a storage facility in Manhattan (the 'Storage Facility'), and placed his belongings inside a particular storage unit (the 'Storage Unit') inside the Storage Facility.  In addition to removing his belongs, Defendant also apparently ransacked the Victim's Apartment.  When the Victim returned to her apartment she found that the inside of her apartment had been ransacked, certain of her clothing was ripped, and a bullet not previously on an end table was standing upright on that table.  (Wolf Ltr. 1.)

The Storage Unit was apparently rented by Defendant under another individual's name using fake identification, and Defendant provided additional alternate contact information for the rental agreement using contact information of the Victim.  (Compl. ¶ 7(a)-(c).)  On or about July 5, 2019, law enforcement officers conducted surveillance of the Storage Unit and observed Gumora exit an elevator on the sixth floor of the Storage Facility, which is the floor where the

---

[1] The facts in this section are taken from the Complaint filed in this action, (Doc. 1), and the Government's letter to me on March 25, 2020, (Doc. 22).

[2] "Compl." refers to the Complaint, dated December 16, 2019.  (Doc. 1.)

[3] "Wolf Ltr." refers to Letter from AUSA Daniel H. Wolf to Judge Vernon S. Broderick, dated March 25, 2020. (Doc. 22.)

Storage Unit is located.  (*Id.* ¶ 7(d).)

On July 5, 2019, a search warrant was executed by law enforcement officers on the Storage Unit.  During the search, the following items, among others, were found:  (1) controlled substances, including methamphetamine, MDMA, and ketamine; (2) paraphernalia consistent with the distribution of controlled substances, including a vacuum sealing device and 36 glass containers; (3) a Smith & Wesson brand, 14-round, .40 caliber magazine; (4) items associated with identity theft, including a professional identification card printer, eight identification cards appearing to be State-issued driver's licenses—including one card that appeared consistent with a New Jersey driver's license, bearing a name other than the defendant's but with a picture depicting the defendant.  (*Id.* ¶ 9(b)(i)-(ix); Wolf Ltr. 1-2.)

Law enforcement officers also arrested Defendant the same day the Storage Unit was searched, and during a search incident to his arrest law enforcement officers found a fake Pennsylvania driver's license issued in the name of a real person ("Real Person-1") but containing a picture depicting Defendant, car keys, and a parking garage ticket.  Once law enforcement officers located Defendant's car ("Defendant's Car") they obtained a search warrant for the car.  During the search of Defendant's Car, law enforcement officers recovered, among other things, a loaded firearm; thirteen rounds of ammunition; and $9,000.  (Compl. ¶ 11(b)-(d); Wolf Ltr. 2.)

Following his arrest by the NYPD on July 5, 2019, the defendant waived his Miranda rights and made a videotaped statement, during which he admitted Defendant's Car was his own and that he sold methamphetamine.  Defendant was subsequently arraigned and remanded to State custody, where he remained until he was transferred to federal custody on the instant charges.  (Compl. ¶ 13(a)-(b); Wolf Ltr. 2.)

3

II.   **Procedural History**

On March 24, 2020, Defendant filed a motion seeking release on bond pursuant to Title 18, United States Code, Section 3142(i) and Federal Rule of Criminal Procedure 46, and filed a supplemental letter later that same day.  (Docs. 20, 21.)  The Government filed a letter in opposition to Defendant's motion on March 25, 2020.  (Wolf Ltr.)  By email dated March 29, 2020, I requested a copy of Defendant Gumora's Record of Arrests and Prosecutions ("RAP sheet"), which I received later that same day.  On March 30, 2020, Gumora's attorney submitted a letter further supplementing his prior submissions.  (Doc. 24.)  On April 2, 2020, I issued an Order denying Defendant's motion that he be released on his own recognizance, inquiring whether or not Defendant would waive his appearance at a telephonic detention hearing, and requesting that the parties meet and confer concerning the timing of the telephonic detention hearing.  (Doc. 25.)  By letter dated April 2, 2020, defense counsel informed me that he had communicated with his client and that his client agreed to waive his appearance at the detention hearing, and provided me with dates the parties were available for the telephonic detention hearing.  (Doc. 26.)  A detention hearing was scheduled and held at 2 p.m. on April 6, 2020.  On the morning of April 6, 2020, I sent the parties a copy of an Order, which was also docketed the next day, requesting that the parties be prepared to address issues and questions identified in that Order during the telephonic detention hearing.  (Doc. 28.)  During the telephonic detention hearing on April 6, 2020, I issued a verbal ruling denying Defendant's motion for temporary release pursuant to 18 U.S.C. § 3142(i).  (*See* Minute Entry dated Apr. 6, 2020.)

### III.   <u>Discussion</u>

Defendant Gumora seeks his release on bond because he "is among the vulnerable population at heightened risk of getting very sick and potentially dying from COVID-19,"[4] and because "[h]is continued pretrial detention poses a grave risk to his health and will meaningfully impact his ability to prepare his defenses."  (Doc. 20, at 17.)  The Government argues in response that Defendant should not be released temporarily from custody pursuant to Section 3142(i) because:  (1) he would pose a risk of flight and a danger to the community; (2) the Metropolitan Correctional Center ("MCC") is capable of protecting the health and safety of Defendant; (3) he has not established a compelling reason for his release; (4) release is not necessary to permit Defendant to assist with his defense; and (5) Defendant does not sufficiently substantiate that he is more at risk in the MCC than he would be in the general public.  (Wolf Ltr. 4-11.)

Defendant Gumora initially consented to detention without prejudice to making a bail application in the future.  (Doc. 4.)  Therefore, since a prior bail determination was not made at Gumora's initial appearance or any time thereafter, I must determine in the first instance whether release or detention is appropriate pursuant to Title 18, United States Code, Section 3142.  If I find that detention would be appropriate, I must then determine whether there is a basis for Defendant Gumora's temporary release pursuant to Section 3142(i).

### A.   *Applicable Law*

#### 1.   **The Bail Reform Act**

The Bail Reform Act "requires a court to order the pretrial release of a defendant on a

---

[4] "COVID-19" refers to the coronavirus disease 2019.  *See generally Coronavirus Disease 2019 (COVID-19), Frequently Asked Questions*, Centers for Disease Control and Prevention (Apr. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html.

personal recognizance bond 'unless [the court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'"  *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (alteration in original) (quoting 18 U.S.C. § 3142(b)).  If a court determines that release on a recognizance bond would not "reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community," 18 U.S.C. § 3142(c)(1), "the law still favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required,'" *Sabhnani*, 493 F.3d at 75 (quoting 18 U.S.C. § 3142(c)(1)(B)).  Section 3142(f) provides in relevant part that a "judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).  However, if after considering the conditions and combination of conditions set forth in subsection (c) a court determines "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order the detention of the person before trial."  18 U.S.C. § 3142(e)(1); *see also Sabhnani*, 493 F.3d at 75 ("Only if a detention hearing shows 'that no condition or combination of conditions will reasonably assure the appearance of the person as required . . . shall [the court] order the detention of the person before trial.'" (alterations in original) (quoting 18 U.S.C. § 3142(e)).

With regard to burden of proof, if the Government is seeking detention based on a defendant's danger, "[t]he facts the judicial officer uses to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the

community shall be supported by clear and convincing evidence."  18 U.S.C. § 3142(f).  If, on the other hand, the Government is seeking detention based on a defendant's flight risk, the Government must first prove by a preponderance of the evidence that the "defendant presents a risk of flight."  *Sabhnani*, 493 F.3d at 68 n.5.

When a defendant is charged with committing "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," the Bail Reform Act imposes a presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3).  "In a presumption case . . . , a defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight."  *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).  "Satisfying the burden of production does not eliminate the presumption favoring detention; it 'remains a factor to be considered among those weighed by the district court.'"  *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *Mercedes*, 254 F.3d at 436).  Therefore, "[e]ven in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that [a] defendant presents a danger to the community," and "by the lesser standard of a preponderance of the evidence that a defendant presents a risk of flight."  *Mercedes*, 254 F.3d at 436.  If the Government successfully demonstrates that a defendant is either a danger to the community or a risk of flight, it must prove by a preponderance of the evidence that there are no conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial and/or the safety of the community if he is released.  To determine whether the Defendant has rebutted the presumptions of dangerousness and flight, the Court considers the four factors listed

in 18 U.S.C. § 3142(g): (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the Defendant; (3) the Defendant's history and characteristics, such as his family ties, employment, community ties, and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual that the Defendant's release would present. *Mercedes*, 254 F.3d at 436.

### 2.   Temporary Release Pursuant to 18 U.S.C. § 3142(i)

Section 3142(i) provides that, where a detention order has previously been issued under Title 18, United States Code, Section 3142(e), "[a] judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).[5] Family members may constitute "appropriate persons" when a defendant is released to relatives and placed under 24-hour home incarceration. *See United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2–3 (S.D.N.Y. Mar. 19, 2020) (granting defendant's request for reconsideration of bail conditions and, in the alternative, releasing the defendant pursuant to § 3142(i) to the custody of his mother as an "appropriate person" and placing defendant under 24-hour home incarceration); *United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225, at *1–2 (S.D.N.Y. Mar. 19, 2020) (releasing the defendant pursuant to § 3142(i) to the custody of his wife as an "appropriate person" and placing defendant under 24-hour home incarceration);

---

[5] Here, Defendant Gumora consented to detention after being brought into federal custody on a writ. (Doc. 4.) Therefore, no previous detention order pursuant to 18 U.S.C. § 3142(e) was issued. I note, however, that if I were asked to rule on whether or not Defendant Gumora should be detained or released on bail in the absence of COVID-19-related issues, I would find that there is no "condition or combination of conditions" that would "reasonably assure [Defendant Gumora's] appearance" or "the safety of any other person and the community," and that Defendant Gumora should therefore be detained. 18 U.S.C. § 3142(e). In any case, I do not read the "subsequent order" language in 18 U.S.C. § 3142(i) to foreclose the temporary release of a defendant under the circumstances.

*United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 146–47 (D.P.R. 2002) (releasing the defendant, who would have otherwise been detained, to the custody of his mother and grandmother on 24-hour house arrest due to his severe injuries); *but see United States v. Landji*, No. (S1) 18 Cr. 601 (PGG), 2020 WL 1674070, at *6 (S.D.N.Y. Apr. 5, 2020) (denying request for release under § 3142(i) where defendant had "not identified an 'appropriate person' into whose custody he could be released"); *United States v. Steward*, S1:20cr0052 (DLC), 2020 WL 1468005, at *1 (S.D.N.Y. Mar. 26, 2020) (denying temporary release pursuant to § 3142(i) in part because defendant had not identified an "appropriate person" with whom he was going to stay).  A "compelling reason" for temporary release exists where release is necessary for the preparation of the defendant's defense.  *See* 18 U.S.C. § 3142(i); *see also United States v. Chandler*, No. 1:19-cr-867 (PAC), 2020 WL 1528120, at *2 (S.D.N.Y. Mar. 31, 2020) (stating that the "right to prepare for [a] defense[] certainly constitute[s] a 'compelling reason' that permits . . . [a defendant's] temporary release [] pursuant to 18 U.S.C. § 3142(i)," and granting such release when defendant's trial was scheduled to begin on May 11, 2020); *Stephens*, 2020 WL 1295155, at *3 (S.D.N.Y. Mar. 19, 2020) (concluding that temporary release was justified in part to enable the defendant to prepare for an evidentiary hearing only six days away); *but see United States v. Eley*, No. 20 Cr. 78-3 (AT), 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020) (denying temporary release under § 3142(i) and stating "with trial scheduled for nine months from now, this case is distinguishable from other instances in which an imminent evidentiary hearing may support a defendant's temporary release"); *United States v. Chambers*, No. 20-CR-135 (JMF), 2020 WL 1530746, at *1 (S.D.N.Y. Mar. 31, 2020) (rejecting defendant's argument that temporary release under § 3142(i) was necessary for the preparation of his defense when non-evidentiary initial pretrial conference was still a month away).  A "compelling reason" may

9

also exist where a defendant's serious medical condition warrants release.  *See United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (explaining that a defendant who is denied bail "retains the ability to request[,] . . . in extraordinary circumstances, . . . temporary release under § 3142(i)" should future developments with respect to his medical conditions so warrant); *United States v. Hernandez*, No. 19 Cr. 169 (VM), 2020 WL 1503106, at *1 (S.D.N.Y. Mar. 30, 2020) (concluding that compelling circumstances existed under § 3142(i) "based on, among other things, the unique confluence of serious health issues and other risk factors facing this defendant, including the defendant's age (64 years old), asthma, and high blood pressure, which place him at a substantially heightened risk of dangerous complications should he contract COVID-19 as compared to most other individuals"); *Perez*, 2020 WL 1329225, at *2 (concluding that compelling circumstances existed under § 3142(i) "based on the unique confluence of serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues"); *United States v. Birbragher*, No. 07-cr-1023-(LRR), 2008 WL 1883504, at *2 (N.D. Iowa Apr. 25, 2008) (describing *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993), and *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002), as cases where courts found "compelling reason" to temporarily release defendants due to the defendants' serious medical issues).[6]

"In considering whether there is a 'compelling reason' for a defendant's release under

---

[6] As outlined by Judge Alison J. Nathan in a recent opinion, in interpreting 18 U.S.C. § 3145's "exceptional reasons" language, "the Second Circuit has described 'exceptional' reasons permitting the release of a defendant subject to mandatory detention—arguably a higher standard than 'compelling' reasons—as those that 'present a unique combination of circumstances giving rise to situations that are out of the ordinary.'"  *Stephens*, 2020 WL 1295155, at *2 n.2 (quoting *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991).  "The Second Circuit has explained that determining whether a given circumstance presents exceptional reasons under Section 3145 requires a case-by-case evaluation by the district judge and that the district judge's discretion is 'constrained only by the language of the statute: 'exceptional reasons.'"  *Id.* (quoting *DiSomma*, 951 F.2d at 497).

this provision, however, a court must 'balance the reasons advanced for such release against the risks that were previously identified and resulted in an order of detention.  In turn, whether temporary release under § 3142(i) is proper requires the individualized analysis of the facts of each case.'" *Chambers*, 2020 WL 1530746, at *1 (citation omitted) (denying temporary release pursuant to § 3142(i) where defendant's asthma-related health risks and desire to prepare for forthcoming initial pretrial conference did not overcome the fact that he was a danger to the community); *see also Eley*, 2020 WL 1689773, at *1 (stating that "[a] court must . . . balance" the relevant considerations, and denying temporary release pursuant to § 3142(i) where defendant, a 23-year old with no apparent medical conditions, was alleged to have committed four shootings); *Landji*, 2020 WL 1674070, at *6 (denying temporary release pursuant to § 3142(i) where defendant, a 58-year old with no unique health conditions, was deemed "a danger to the community and pose[d] a significant flight risk"); *United States v. Marte*, 19-CR-795 (SHS), 2020 WL 1505565 at *1 (S.D.N.Y. Mar. 30, 2020) (denying temporary release pursuant to § 3142(i) because defendant, a 42-year old with no preexisting medical issues, was alleged to be the leader of an oxycodone conspiracy and also charged pursuant to 18 U.S.C. § 924(c)); *Steward*, 2020 WL 1468005, at *1 (denying release under § 3142(i) in part because "defendant's release into the community would endanger the safety of the community," and because there was "no reason to find that the defendant's release would lessen the risk to his health presented by COVID-19").  "A defendant has the burden of showing that temporary release is 'necessary . . .' under Section 3142(i)." *Stephens*, 2020 WL 1295155, at *2 (alteration in original) (quoting *United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011)).

B.     *Application*

## 1.  Initial Bail Reform Act Determination

Defendant is charged with a narcotics offense that carries a maximum term of imprisonment of twenty years.  Because Defendant is charged with a narcotics offense with a maximum term of imprisonment of ten years or more, he is subject to the presumption "that no condition or combination of conditions will reasonably assure [his] appearance . . . as required and the safety of the community."  18 U.S.C. § 3142(e)(3).  Defendant's only attempt to rebut this presumption by "coming forward with evidence that he does not pose a danger to the community or a risk of flight," *Mercedes*, 254 F.3d at 436, is his assertion that 24-hour electronic monitoring and the overwhelming danger of contracting COVID-19 should he ignore conditions of home confinement eliminate the risks of granting his release.  (Doc. 20, at 16–17.)[7]  I do not find Defendant's mere assurances to be sufficient to rebut the presumption of detention.  In any case, in considering whether or not Defendant has rebutted this presumption, I further consider "(1) the nature and circumstances of the crime charged; (2) the weight of the evidence against [][D]efendant; (3) the history and characteristics of [] [D]efendant, including family ties, employment, community ties, and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual" that the Defendant's release would present.  *Mercedes*,

---

[7] Defendant also argues that "factual circumstances that contributed to his previous counsel's consent to detention have been ameliorated by subsequent developments in his New York [C]ounty case," namely, that Defendant Gumora entered a plea of guilty in his New York County case on March 11, 2020, and has been promised time served.  (Doc. 20, at 1-2.)  However, I do not find this changed legal circumstance to be evidence that affects my risk calculus under 18 U.S.C. § 3142(e).  Moreover, as the Government stated in its opposition and reiterated during the telephonic detention hearing, when the Government decided to charge Defendant, the State authorities "agreed to maintain only so much of their case against the defendant that would allow them to obtain a protective order governing the defendant's contact with the Victim.  In turn, the Government would pursue charges against the defendant for his gun possession and narcotics distribution—the latter of which is part of a larger investigation."  (Wolf Ltr. 3.)  In other words, New York's decision to offer Defendant time served in the New York County case had nothing to do with the strength of the underlying case against Defendant or a determination by the State authorities that bail was appropriate.

254 F.3d at 436.

### a.   The Nature and Circumstances of the Crimes Charged

Defendant is charged with distribution and possession with intent to distribute methamphetamine and ketamine, and with being a felon in possession of a firearm.  Defendant Gumora was arrested, at least in part, because of an argument he had with his then girlfriend on June 21, 2020, during which he brandished a firearm.  Not only did Defendant brandish a firearm, when he left the apartment he sent his former girlfriend a text stating "I will break your fucking jaw."  The next day, when he was removing his belongings from his girlfriend's apartment, he ransacked the apartment and left a bullet as an apparent threat or warning.  These facts demonstrate a level of dangerousness that supports a finding that Defendant poses a danger to the community and strengthens the statutory presumption with regard to dangerousness.

### b.   The Weight of the Evidence Against the Defendant

As this stage of the case, the evidence against Defendant appears to be overwhelming. Law enforcement officers executed two search warrants that resulted in the seizure of a wealth of evidence.  This evidence was seized from the Storage Unit Defendant rented using an identification with a false name but his own photograph, and Defendant was seen on the day the search warrant was executed leaving the floor of the Storage Facility on which the Storage Unit was located.  Some of the evidence seized during the execution of the search warrant included items Defendant took from his former girlfriend's apartment, placed in a carry-on luggage bag, and put into the Storage Unit.  Specifically, during the execution of the search warrant, officers seized, among other things, the following:  (1) controlled substances, including methamphetamine, MDMA, and ketamine; (2) paraphernalia consistent with the distribution of controlled substances, including a vacuum sealing device and 36 glass containers; (3) a Smith &

Wesson brand, 14-round, .40 caliber magazine; (4) items associated with identity theft, including a professional identification card printer, eight identification cards appearing to be State-issued driver's licenses—including one card that appeared consistent with a New Jersey driver's license, bearing a name other than the defendant's but with a picture depicting the defendant. (Compl. ¶ 9(b)(i)-(ix); Wolf Ltr. 1-2.)

Officers also seized a wealth of evidence from Defendant incident to his arrest, and during the execution of the search warrant for his car.  At the time of his arrest, Defendant was found in possession of a fake Pennsylvania driver's license issued in the name of another person but with Defendant's picture, car keys to his car, and a parking garage ticket.  Law enforcement officers located Defendant's Car illegally parked in Manhattan.  Officers obtained a search warrant for the car, and during the execution of that warrant seized, among other things:  a loaded firearm; thirteen rounds of ammunition; and $9,000 in cash.  (Compl. ¶ 11(b)-(d); Wolf Ltr. 2.)

Following his arrest, Defendant waived his Miranda rights and gave a videotaped statement, during which he admitted that he owned the car that was searched and that he sold methamphetamine.

The weight of the evidence is overwhelming.  It not only includes physical evidence tied to Defendant, but also his own videotaped statement acknowledging ownership of the car from which the loaded firearm and ammunition were seized as well as his role as a trafficker in methamphetamine.  The amount and weight of the evidence lends support to a finding that Defendant is a danger to the community and a risk of flight, and bolsters the statutory presumption.

c. <u>The Defendant's History and Characteristics</u>

Defendant's interaction with his former girlfriend, his arrests for violating orders of protection, arrests for criminal contempt, and one conviction for criminal contempt each shed light on his individual characteristics. His arrest record is also scattered with arrests for domestic incidents. Although it is not clear what the underlying facts were with regard to these other domestic incidents, the arrests themselves weigh against Defendant's release.

Defendant's RAP sheet is 38 pages long. His arrest record dates back to 2003 when Defendant was 21 years old. According to his RAP sheet, Defendant has been arrested approximately 22 times and convicted 16 times, seven of which were for felonies. He has at least one prior narcotics conviction, numerous arrests and one conviction for possession of forged instruments, numerous arrests and one conviction for identity theft, arrests and convictions for criminal contempt, arrests for violating orders of protection, an arrest for harassment, an arrest for stalking, and several arrests for domestic incidents. Not only does Defendant have a lengthy criminal record, he also has a lengthy history of failing to abide by the terms of his release after arrests and when on supervision. Defendant's RAP sheet contains numerous notations where warrants were issued for his failure to appear, and one felony conviction for bail jumping. Finally, at the time Defendant was arrested he was on parole.

Defendant's history of failing to abide by release conditions, conviction for identity theft, conviction for possession of a forged instrument, and his conviction for bail jumping amply support a finding by a preponderance of the evidence that Defendant is a flight risk. This risk is further heighted by the fact that Defendant Gumora faces the prospect of a lengthy prison sentence—as calculated by the Government, 66 to 78 months' imprisonment assuming full acceptance of responsibility. Defendant's record and the prospect of a lengthy sentence bolsters

the statutory presumption for risk of flight.

          d.   <u>The Nature and Seriousness of the Danger to the Community or to an Individual</u>

Defendant's arrest for and admitted involvement in narcotics trafficking raise the presumption and specter of danger to the community. Defendant's history of failing to abide by the terms of his release, and his commission of crimes while on pretrial release and/or parole also support a finding that Defendant is a danger to the community. In addition, Defendant does not have a job if he is temporarily released and therefore could not independently support himself, or even contribute funds to the mother of his 7-year-old son (the "Mother") with whom he intends to live. This could lead to Defendant's participation in illegal activity as a means to obtain money. To summarize, Defendant's sale of narcotics endangers members of the community, and the likelihood Defendant will commit new crimes on release as he has in the past would also endanger the community.

In addition, Defendant's history of arrests for domestic incidents, including arrests for violating orders of protection, are red flags and troubling. Since 2003, Defendant Gumora has had 14 domestic incident reports filed against him by 7 different female complainants. Of the domestic reports filed by the 7 complaints, 6 involved allegations of threats made against the complainants themselves. The Mother is also among the 7 complainants, and the incident reports she filed were filed between March 13, 2016 to March 30, 2017, and involved allegations of threats made against her and included an allegation of physical contact.[8] Any argument that these prior incidents are stale and are not indicative of Defendant's character is belied by the facts leading to Defendant's arrest, which include allegations that during a verbal argument

---

[8] I note that despite this history the Mother proffered through defense counsel that prior to Defendant's arrest, the Mother and Defendant had intentions of getting married, and that she does not believe Defendant will threaten her in the future.

Defendant brandished a firearm in front of his then girlfriend, threatened to break her jaw, ransacked her apartment, and left a bullet on an end table—standing on end—as a threat.  These facts bolster the statutory presumption related to dangerousness, and support a finding "by clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).

Therefore, I find that the government has satisfied its "ultimate burden of persuasion by clear and convincing evidence that [D]efendant presents a danger to the community," and "by the lesser standard of a preponderance of the evidence that [D]efendant presents a risk of flight," *Mercedes*, 254 F.3d at 436, and conclude that Defendant's detention is warranted.

### 2. Reasons Advanced for Defendant's Release Pursuant to 18 U.S.C. § 3142(i)

I now consider Defendant's proffered reasons why his "release [is] necessary for preparation of [his] defense or for another compelling reason."  18 U.S.C. § 3142(i).  Defendant Gumora argues that his temporary release is necessary to enable him to prepare his defense.  Defendant Gumora further argues that his various health conditions place him at an increased risk of becoming seriously ill or dying if he contracts COVID-19, and that he is at an increased risk of contracting COVID-19 while incarcerated.  I find that both arguments are insufficient to warrant temporary release in this case.

As an initial matter, Gumora has not provided any details concerning why he needs to be released to prepare his defense.  The closest he comes to setting forth evidence supporting his claim is an assertion that he faces "the same challenges" as a defendant, Dante Stephens, in a case pending before Judge Alison J. Nathan.  Gumora's reliance on Judge Nathan's decision in *Stephens* is misplaced.

Judge Nathan issued her decision releasing defendant Stephens on March 19, 2020.

Stephens was being detained prior to a violation of supervised release hearing scheduled for March 25, 2020, involving his alleged possession of a firearm, and Judge Nathan released him into the custody of his mother under 24-hour home incarceration.  *See Stephens*, 2020 WL 1295155, at *3.  Although Judge Nathan revisited her earlier decision denying Stephens's request that she reverse the bail decision of Magistrate Judge Kevin Nathaniel Fox because of changed circumstances—related to both the facts underlying the violation and the COVID-19 pandemic generally—she also concluded in the alternative that his release was necessary under 18 U.S.C. § 3142(i) to allow Stephens to prepare his defense for the March 25, 2020 hearing.  *See id*. at *1–3.  Specifically, she reached this conclusion because she found that the COVID-19 pandemic, and the transmission mitigation measures taken by the Federal Bureau of Prisons ("BOP") and Metropolitan Correctional Center ("MCC") in response thereto, posed obstacles to the defendant's preparation of his defense in advance of his violation hearing scheduled for March 25, 2020.  *See id*. at *3 ("the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)" warranting defendant's temporary release).  Although Stephens further argued, as Gumora does here, that "the current public health crisis itself provide[d] an additional compelling reason necessitating his release," Judge Nathan declined to consider this "additional factor" because of her determination that temporary release was necessary for the preparation of his defense.  *Id.* at *3 n.3.

Here, unlike in *Stephens*, no hearing or forthcoming proceeding is scheduled that would require preparation involving the Defendant.  *See Eley*, 2020 WL 1689773, at *1 (denying temporary release under § 3142(i) and stating "with trial scheduled for nine months from now, this case is distinguishable from other instances in which an imminent evidentiary hearing may

support a defendant's temporary release"); *Chambers*, 2020 WL 1530746, at *1 (rejecting defendant's argument that temporary release under § 3142(i) was necessary for the preparation of his defense when non-evidentiary initial pretrial conference was still a month away).  In fact, the indictment was returned on February 19, 2020, Defendant Gumora was arraigned on February 27, 2020, Defendant Gumora pled not guilty at his arraignment and a status conference was scheduled for April 17, 2020; but no trial date has been set, nor has a schedule for pretrial motions been set.

Moreover, as mentioned, Judge Nathan revisited her prior bail determination based in part on a change in the facts underlying the defendant's violation.  Specifically, Judge Nathan found that evidence had come to light "indicat[ing] that the Government's case [was] weaker than it believed it to be" at the time she made her initial bail decision during a March 6, 2020 hearing and those facts were relevant to her "prior conclusion that the [d]efendant failed to establish by clear and convincing evidence that he did not pose a danger to the community." *Id.* at *1.  With regard to the March 6, 2020 bail hearing, Judge Nathan found that the question concerning whether Stephens had met his burden of demonstrating that he was not a danger was a "close one" because "[d]efense counsel presented ample evidence at that hearing that aside from the arrest from which the alleged violation of supervised release arises, the [d]efendant [did] not have a violent background:  no prior convictions involved violent conduct or gun charges." *Id.* at *3.  Based upon the changed circumstances, Judge Nathan found that Stephens had "established by clear and convincing evidence that he [did] not pose a danger to the community." *Id.*  As noted above, the evidence before me related to detention is strong and supports a finding by a preponderance of the evidence that Defendant is a flight risk and by clear and convincing evidence that he is a danger to the community. *See Marte*, 2020 WL 1505565, at

*1 (denying temporary release pursuant to § 3142(i) because defendant who was alleged to be the leader of an oxycodone conspiracy and also charged pursuant to 18 U.S.C. § 924(c) failed to overcome presumption pursuant to § 3142(e)); *cf. Chandler*, 2020 WL 1528120, at *1 (granting temporary release under § 3142(i) less than two months before trial to a defendant previously convicted of manslaughter and charged with being a felon in possession of a firearm, where defendant maintained his innocence and represented that recently disclosed *Brady* material "directly undercut[] the prosecution's theory of the case").

Defendant also argues that the COVID-19 health crisis and the conditions in the MCC constitute a compelling reason justifying his temporary release to the apartment of the mother of his seven-year-old son.  Specifically, Defendant claims he has the following health conditions that place him at increased risk:  (1) HIV; (2) asthma; (3) high blood pressure; and (4) various heart conditions—arrhythmia, tachycardia and bradycardia.  (Doc. 24, at 1.)  Although I have not been provided any documentation for Defendant's various health conditions, I accept that Defendant suffers from each of the ailments he claims for the purpose of rending this decision assessing whether he has met his burden of establishing that his release is "necessary for preparation of [his] defense or for another compelling reason."  18 U.S.C. § 3142(i).[9]  Despite my acceptance of Defendant's assertion that he has various health issues that place him in a category of individuals at an increased risk of getting severely ill or dying if they contract COVID-19, Defendant's increased risk cannot be viewed in isolation, but must be assessed in the context of measures in place at MCC and the risks Defendant poses to the community and his risk of flight.  *See Chambers*, 2020 WL 1530746 at *1; *Eley*, 2020 WL 1689773, at *1.[10]

---

[9] Again, a health consideration was not the rationale for Judge Nathan's ruling in *Stephens*.  2020 WL 1295155, at *3 n.3.

[10] Two recent decisions in this district appear to have granted 18 U.S.C. § 3142(i) release requests based primarily or solely on the defendants' unique health risks in light of COVID-19, with no on-the-record balancing of these health

As the Government points out, the Federal Bureau of Prisons ("BOP") developed and has

implemented a plan to mitigate the impact of COVID-19 on the federal prison population.  In

January 2020, the BOP began to plan specifically for COVID-19 to preserve the health and

safety of inmates and BOP personnel.  *See Federal Bureau of Prisons COVID-19 Action Plan*,

Fed. Bureau of Prisons (updated Mar. 13, 2020),

https://www.bop.gov/resources/news/20200313_covid-19.jsp.  The plan has thus far included

five phases that have been implemented beginning in January 2020, including, among other

things, the following:

- Phase 1:  The establishment of a task force to develop strategic planning for
  COVID-19, including adding to already existing procedures for pandemics.
  *See Statement from BOP Director*, Fed. Bureau of Prisons (updated Mar. 26,
  2020),

---

risks against the risks justifying the courts' prior orders of detention.  *See Hernandez*, 2020 WL 1503106, at *1 ("The Court's decision in this case is based on, among other things, the unique confluence of serious health issues and other risk factors facing this defendant, including the defendant's age (64 years old), asthma, and high blood pressure, which place him at a substantially heightened risk of dangerous complications should he contract COVID-19 as compared to most other individuals.  Accordingly, this Order should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case."); *Perez*, 2020 WL 1329225, at *2 ("The Court's decision in this case is based on the unique confluence of serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues, which place him at a substantially heightened risk of dangerous complications should be contract COVID-19 as compared to most other individuals.  Accordingly, this Order should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case.").  Other decisions have described a defendant's unique health condition in light of COVID-19 as potentially sufficient to satisfy 18 U.S.C. § 3142(i)'s "compelling reason" requirement.  *See Marte*, 2020 WL 1505565, at *1 ("Pursuant to 18 U.S.C. § 3142(i), the Court concludes that, in the absence of any evidence that defendant has a special condition making him substantially vulnerable to Covid-19, the pandemic alone, which is affecting the community in its entirety, is not a compelling reason warranting release at this point in time.").  However, 18 U.S.C. § 3142(i) states that a court "*may* . . . permit []" temporary release," (emphasis added), affording district courts discretion to deny release requests even when presented with a "compelling reason."  In any case, "[a] court must . . . balance," *Eley*, 2020 WL 1689773, at *1 (citing *Chambers*, 2020 WL 1530746 at *1), the defendant's proffered reasons for release against the identified risks that resulted in an initial order of detention, and a defendant's health risks alone should not be sufficient to justify release absent actual consideration of the Bail Reform Act factors—the defendant's danger to the community and risk of flight.  *See also United States v. Guzman*, No. 20 CR. 56 (PAC), 2020 WL 1700253, at *1 (S.D.N.Y. Apr. 8, 2020) ("In considering whether there is a 'compelling reason' for a defendant's release under this provision, the Court balances the reasons advanced for such release against the risk[s] that were previously identified and resulted in an order of detention."); *United States v. Chang Zou*, No. S1 20 CR. 51 (PAC), 2020 WL 1700252, at *1 (S.D.N.Y. Apr. 8, 2020) (same); *United States v. Conley*, No. 19-CR-131 (PAE), ECF No. 366, at 2 (Mar. 31, 2020) (balancing the defendant's health risk against the Bail Reform Act considerations and concluding that "the danger to the community presented by [defendant's] release outweighs, substantially, the danger to himself presented by his incarceration at the MCC").

*https://www.bop.gov/resources/news/20200326_statement_from_director.jsp*

- Phase 2:  The issuance of directives on March 13, 2020, suspending social and legal visits, limiting inmate movement, cancelling staff travel and training, limiting access for contractors and volunteers to facilities, and establishing enhanced screening for staff and inmates for locations with sustained community transmission and at all prison medical centers.[11]  Facilities were also placed on modified operations to facilitate social distancing by, among other things, staggering meal times and recreation times.  BOP also established quarantine and isolation procedures.  *See Federal Bureau of Prisons COVID-19 Action Plan*, Fed. Bureau of Prisons (updated Mar. 13, 2020), [https://www.bop.gov/resources/news/20200313_covid-19.jsp](https://www.bop.gov/resources/news/20200313_covid-19.jsp).

- Phase 3:  On March 18, 2020, the initiation of a plan for locations performing administrative services, following guidance from other Government agencies, to maximize teleworking.  *See Bureau of Prisons Update on COVID-19*, U.S. Dep't of Justice (Mar. 24, 2020), *available at* [https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf](https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf).

- Phase 4:  On March 26, 2020, the BOP implemented revised preventative measures for all institutions. The agency updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community trans[mission] area or not, be assessed using a screening tool and temperature check.  This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival.  Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff.  Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.  *See COVID-19 Action Plan: Phase Five*, Fed. Bureau of Prisons (updated Mar. 31, 2020), [https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp](https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp).

- Phase 5:  On April 1, 2020, BOP implemented the following actions to further mitigate the exposure and spread of COVID-19:  (1) for a 14-day period, inmates would be secured in their assigned cells/quarters to decrease the spread of the virus; (2) coordination with the United States Marshals Service ("USMS") to decrease inmate movements during the 14-day time period; (3) during the 14-day time period, limited group gatherings will be permitted to the extent practical to facilitate commissary, laundry, showers, telephone, and computer access; (4) these modified operations will be re-evaluated after 14 days, and a decision made as to whether or not to return to modified operations.  *See id.*

Although as of April 14, 2020, there have been a total of 13 confirmed cases at MCC (5 inmates

---

[11] For inmates these measures include the following:  (1) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (2) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (3) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols."  *Federal Bureau of Prisons COVID-19 Action Plan*, Fed. Bureau of Prisons (updated Mar. 13, 2020), [https://www.bop.gov/resources/news/20200313_covid-19.jsp](https://www.bop.gov/resources/news/20200313_covid-19.jsp).

and 8 staff), *COVID-19 Coronavirus*, Fed. Bureau of Prisons (last accessed Apr. 14, 2020),

https://www.bop.gov/coronavirus/index.jsp, the implementation of the actions detailed above

appears to have limited the spread of the virus within the institution.

Defendant essentially argues that the COVID-19 health crisis itself combined with his

fear of becoming ill should he ignore conditions of home confinement sufficiently mitigates his

risk of flight.  I accept for the purpose of this decision that Defendant Gumora is concerned about

contracting COVID-19.  However, Gumora's extensive criminal record unequivocally

demonstrates that he has been unable to abide by the terms of his release in the past when

released pending trial or on parole.  In other words, Gumora's history demonstrates that he has

virtually no impulse control, and reliance on his word that this time it will be different is not

sufficient to outweigh the reasons for his detention detailed above.

Similarly, Gumora has not presented evidence that mitigates the danger he poses to the

community.  To the contrary, Gumora's criminal record demonstrates an inability to abide by the

terms of his release and his commission of additional crimes while on release is itself evidence of

the danger he would pose to the community in general if released.  Additionally, Defendant

Gumora also presents a danger to individuals.  Based upon his criminal record and information

disclosed during the detention hearing on April 6, 2020, Defendant Gumora clearly has a

problem interacting with women.  *See* Parts III(B)(1)(a), (c)-(d), *supra*.  Specifically, since 2003,

seven different women have filed numerous domestic incident reports against Gumora, six of

those alleging he threatened them with violence.  Those women include the Victim and the

Mother.  With regard to the Victim, Gumora threatened her with a gun, sent a text to her

threatening to break her jaw, ransacked her apartment, and left a bullet conspicuously placed

standing upright on an end table as a threat.  Defendant Gumora now also knows that his former

girlfriend filed a domestic incident report against him, has been communicating with law enforcement about him, and testified in the state grand jury that returned an indictment against him.  In addition, Defendant has a history of violating orders of protection which were meant to be deterrents to him approaching or contacting the women who have obtained them.  I also note that there is no evidence in the record to suggest that Defendant has overcome his problem with women through counseling or some other means.  Balancing these facts against Defendant's assertion and belief that he will not interact with or contact his former girlfriend, I find that Defendant has not met his burden of demonstrating that his health conditions—in light of the COVID-19 health crisis and the conditions of confinement at MCC— when balanced against the danger he poses to the community in general and his former girlfriend in particular, amount to a sufficiently compelling reason to warrant granting him temporary release.

I also find that Defendant poses a danger to the Mother, even accepting Gumora's pledge and the Mother's belief that they will not have domestic disputes and that their relationship is changed.  Here, I balance the beliefs and commitments of Defendant and the Mother that they will not have domestic issues against Defendant's extensive history of having domestic incident reports filed against him by women, including by the Mother, and the facts related to the Victim. I note that although the Mother and Gumora—through a proffer made by his defense counsel— both claim that they were planning on getting married, Gumora was living with the Victim at least part of the time on June 21, 2020, when they got into a verbal dispute.  Neither party could tell me what the verbal dispute between Gumora and the Victim was about, but there is no evidence that the dispute concerned Gumora's intent to leave the Victim for the Mother. Therefore, I do not find the assertion by Defendant and the Mother that they were planning to get married as being sufficient evidence to support the argument that if Defendant is temporarily

24

released to live in the Mother's apartment that domestic disputes/issues will not arise.  When

these facts are considered in light of the apparently toxic relationship between Defendant and the

Mother—based upon the filing of domestic incident reports by the Mother against Gumora—[12]

and Defendant's history with women, I find that Defendant has not met his burden to

demonstrate that his health conditions—in light of the COVID-19 health crisis and the conditions

of confinement at MCC—when balanced against the danger he poses to the Mother, amount to a

sufficiently compelling reason to warrant granting him temporary release.[13]

### IV.   Conclusion

My decision in this case is based on the unique circumstances of Defendant Gumora and

the context in which his motion has been made, including:  (1) the current COVID-19 pandemic

and Defendant's health conditions; (2) the underlying charges; (3) the status of the case; (4) the

BOP's COVID-19 transmission mitigation measures; (5) Defendant's RAP sheet; (6)

Defendant's history of violating the terms of his release from custody; and (7) Defendant's

specific history of threatening behavior towards women, and in particular towards the Victim,

and the Mother.  Accordingly, this Order should not be construed as a blanket determination so

as to preclude the possibility that another defendant's circumstances might present an appropriate

---

[12] In light of this history, I also find that the Mother does not qualify as an "appropriate person" under Section 3142(i).

[13] Melissa DeRosa, Secretary to New York Governor Andrew Cuomo, has reported a 15% to 20% increase in the number of domestic violence cases in New York since the COVID-19 stay at home measures were recommended and implemented.  *See Gov Andrew Cuomo New York COVID-19 Briefing April 3: NY Passes 100,000 Cases*, Rev (last accessed Apr. 14, 2020), https://www.rev.com/blog/transcripts/gov-andrew-cuomo-new-york-covid-19-briefing-april-3-ny-passes-100000-cases; *see also Gov. Andrew Cuomo NY COVID-19 Press Conference April 9*, Rev (last accessed Apr. 14, 2020), https://www.rev.com/blog/transcripts/gov-andrew-cuomo-ny-covid-19-press-conference-april-9 ("We have a growing problem with a number of domestic violence cases.").  The New York City Mayor's Office to End Domestic and Gender-Based Violence has also reported that the number of visitors to NYC HOPE, the City's resource directory for domestic and gender-based violence survivors, has more than doubled since cases of COVID-19 began to rise in New York City.  *See Message from Commissioner Cecile Noel*, *April 2020 Bulletin*, NYC Mayor's Office to End Domestic and Gender-Based Violence (last accessed April 14, 2020), https://www1.nyc.gov/assets/ocdv/html/newsletter/2020/202004_endgbv_monthly_bulletin_april_10_2020.html.

basis for temporary release on bail.  In other words, my decision is exclusively based upon the unique set of facts and circumstances of this case detailed in this Opinion & Order.

For the reasons stated above, I find after balancing the reasons advanced for temporary release against Defendant's risk of flight and danger to the community and specific individuals that temporary release is not appropriate under Section 3142(i); therefore, Defendant's motion is DENIED.

SO ORDERED.

Dated:    April 14, 2020
          New York, New York

Vernon S. Broderick
United States District Judge